1      UNITED STATES DISTRICT COURT
2         DISTRICT OF PUERTO RICO

3   HARRY RODRÍGUEZ-RIVERO, et al.,

4       Plaintiffs,
                                        Civil No. 08-1016 (JAF)
5       v.

6   PEDRO TOLEDO-DÁVILA, et al.,

7       Defendants.


8                   **OPINION AND ORDER**

9       Plaintiffs, Harry Rodríguez-Rivero ("Rodríguez"); Linette Miró-

10  Quiñones; and their conjugal partnership, bring the present action

11  under 42 U.S.C. § 1983 against Defendants, Pedro Toledo-Dávila

12  ("Toledo") and Rafael Ramos-Vélez ("Ramos"), each in his personal

13  capacity, and an unnamed insurance company, alleging violations of

14  Rodríguez' rights under the U.S. Constitution.[1] (Docket No. 17.)

15  Plaintiffs also allege violations of their rights under Puerto Rico

16  law. (Id.) Defendants Toledo and Ramos (together, "Movants") move for

17  summary judgment pursuant to Federal Rule of Civil Procedure 56(c)

18  (Docket No. 70), and Plaintiffs oppose (Docket No. 82).

---

[1] Plaintiffs also sued unnamed police officers and supervisors, but said defendants were later dismissed on Toledo's motion. (See Docket Nos. 34; 37.)

1                                    I.

2                      **Factual and Procedural History**

3          We derive the following factual and procedural summary from the

4     parties' pleadings, motions, exhibits, and statements of uncontested

5     facts. (Docket Nos. 17; 30; 39; 69; 70; 73; 81; 82.)

6          At the time of the alleged constitutional violations, Toledo was

7     superintendent of the Puerto Rico Police Department ("PRPD"), and

8     Ramos was a PRPD officer involved in Rodríguez' arrest.

9          On January 8, 2007, Rodríguez exited on foot a convenience store

10    in San Juan, Puerto Rico.  According to Rodríguez, he got into his

11    car, which had been parked in front of the store, pulled away from

12    the curb, and started down the road.  (Docket No. 70-2 at 9-11.)

13    Shortly thereafter, a group of men in plain clothes surrounded his

14    car, wielding firearms and demanding that he exit the car.  (Id. at

15    11-14, 18.)   Believing himself and his car in danger, Rodríguez

16    panicked and fled the gunmen; he reversed, running into the car

17    behind him, then put his car into drive and sped away.  (Id. at 11-

18    15, 21.)  Not far down the road, he heard police sirens and pulled

19    over immediately.  (Id. at 26.)  Four marked police vehicles pulled

20    up behind him, and police surrounded his vehicle with their weapons

21    drawn.  (Id. at 28-29.)  The police threatened to kill him, pulled

22    him out of the car, dropped him on the ground, hit his mouth, and

23    grabbed his legs and dragged him face down on the pavement before

1    they handcuffed him and lifted him to his feet. (Id. at 29-30;

2    Docket No. 70-6 at 4-9.)   At no time did Rodríguez resist the

3    officers. (Docket No. 70-6 at 7.)   The officers then placed him in

4    an unmarked police vehicle and took him to the police station, where

5    they processed his arrest and held him for several hours. (See id.

6    at 9-10, 16, 23.)   They tested his blood alcohol content, cited him

7    for driving under the influence, and released him. (See id. at 26.)

8         Although neither Rodríguez nor the woman whose car he hit, a

9    witness to the present action, knew it at the time, the gunmen who

10   originally approached Rodríguez' car were plain-clothed police

11   officers. (See, e.g., Docket Nos. 70-2 at 11; 81-3 at 5, 10.)   Said

12   officers were all members of the PRPD drug and narcotics division,

13   deployed as if to run a drug intervention. (See Docket No. 81-6 at

14   2-3.)   Nothing in the record explains why they initially approached

15   Rodríguez.

16        Ramos participated in the foregoing events, but the extent of

17   his participation is disputed.  By his own testimony, Ramos witnessed

18   Rodríguez' hit-and-run (Docket No. 81-6 at 2), which places him among

19   the officers involved in the initial intervention.  Despite his sworn

20   testimony, Ramos maintains in his motion that his first involvement

21   came after Rodríguez was handcuffed. (See, e.g., Docket No. 70 at

22   17.)   Undisputed is that Ramos then led Rodríguez to the car, rode in

23   the backseat with him to the station, processed his arrest paperwork,

Civil No. 08-1016 (JAF)                                              -4-

1    and interacted with him during the course of his detention.   (See,

2    e.g., Docket No. 70-6 at 17.)

3         As to Toledo's involvement, Plaintiffs allege that he was

4    charged with ensuring that PRPD officers were trained properly

5    regarding constitutional violations.  (Docket No. 17.)  But according

6    to Toledo, Toledo's subordinate was the one responsible for

7    organizing and executing such training.  (Docket No. 81-4 at 1.)  To

8    Toledo's knowledge, that training occurred monthly and without

9    problems.  (Id. at 8.)  Ramos, however, testified that he had never,

10   in four years at the PRPD, received this required, monthly training.

11   (Docket No. 81-2 at 10.)

12        On January 8, 2008, Plaintiffs filed suit in this court.

13   (Docket No. 1.)  On July 17, 2008, they filed an amended complaint.

14   (Docket No. 17.)  On November 17, 2008, under Federal Rule of Civil

15   Procedure 12(b)(6) and on Defendant Toledo's motion, this court

16   dismissed Plaintiffs' claims against Toledo in his official capacity,

17   and the 42 U.S.C. § 1983 claims of Miró and the Miró-Rodríguez

18   conjugal partnership.  (Docket No. 26.)  Movants moved for summary

19   judgment on October 2, 2009, as to the remaining claims against them

20   (Docket No. 70), and Plaintiffs opposed on October 29, 2009 (Docket

21   No. 82).

Civil No. 08-1016 (JAF)                                                    -5-

1                                    **II.**

2                   **Summary Judgment Under Rule 56(c)**

3        We grant a motion for summary judgment "if the pleadings, the

4   discovery and disclosure materials on file, and any affidavits show

5   that there is no genuine issue as to any material fact and the movant

6   is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

7   A factual dispute is "genuine" if it could be resolved in favor of

8   either party and "material" if it potentially affects the outcome of

9   the case. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19

10  (1st Cir. 2004).

11       The movant carries the burden of establishing that there is no

12  genuine issue as to any material fact. Celotex Corp. v. Catrett, 477

13  U.S. 317, 325 (1986).  In evaluating a motion for summary judgment,

14  we view the record in the light most favorable to the nonmovant.

15  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

16       "Once the moving party has made a preliminary showing that no

17  genuine issue of material fact exists, the nonmovant must 'produce

18  specific facts, in suitable evidentiary form, to establish the

19  presence of a trialworthy issue.'" Clifford v. Barnhart, 449 F.3d

20  276, 280 (1st Cir. 2006) (quoting Triangle Trading Co. v. Robroy

21  Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)).  The nonmovant "may not

22  rely merely on allegations or denials in its own pleading; rather,

Civil No. 08-1016 (JAF)                                              -6-

1    its response must . . . set out specific facts showing a genuine

2    issue for trial." Fed. R. Civ. P. 56(e)(2).

3                                  **III.**

4                                **<u>Analysis</u>**

5         Movants argue that they are entitled to summary judgment because

6    (1) Plaintiffs have failed to establish a cause of action under

7    § 1983 for violation of Rodríguez' Fourth and Fourteenth Amendment

8    rights; and (2) Movants are entitled to qualified immunity. (Docket

9    No. 70.)  We address each argument in turn.

10   **A.   <u>Prima-Facie Case Under the Fourth and Fourteenth Amendments</u>**

11        Section 1983 provides a civil remedy for violation of a federal

12   right by a person acting under the color of state or territorial law.

13   42 U.S.C. § 1983.  In addition, under § 1983, a supervisory official

14   may be held liable for his subordinates' behavior, but only if

15   (1) his subordinates' behavior resulted in a constitutional

16   violation; and (2) the official's action or inaction was

17   affirmatively linked to that behavior such that "it could be

18   characterized as supervisory encouragement, condonation or

19   acquiescence or gross negligence amounting to deliberate

20   indifference." <u>Pineda v. Toomey</u>, 533 F.3d 50, 54 (1st Cir. 2008)

21   (internal quotation marks omitted) (quoting <u>Lipsett v. Univ. of P.R.</u>,

22   864 F.2d 881, 902 (1st Cir. 1988)).

1       Plaintiffs allege Ramos' direct violation both of Rodríguez'

2   Fourth Amendment rights, in arresting Rodríguez without probable

3   cause and in using excessive force while effecting that arrest, and

4   of Rodríguez' substantive due process rights under the Fourteenth

5   Amendment, in originally approaching Rodríguez in the manner

6   described above in Part I. (See Docket Nos. 17; 82 at 8.)  Plaintiffs

7   also allege Toledo's supervisory liability for said violations.

8   (Docket No. 17.) We examine each alleged violation, in turn, and then

9   discuss Movants' involvement in same.

10       **1.   Fourth Amendment**

11       The Fourth Amendment prohibits "unreasonable searches and

12   seizures." U.S. Const. amend. IV.  If a crime is committed in an

13   officer's presence, the ensuing arrest is considered a reasonable

14   seizure of the offender.  See Atwater v. City of Lago Vista, 532 U.S.

15   318, 354 (2001).  Indeed, "[i]f an officer has probable cause to

16   believe that an individual has committed even a very minor criminal

17   offense in his presence, he may, without violating the Fourth

18   Amendment, arrest the offender."  Id.

19       In the present case, the PRPD officers arrested Rodríguez after

20   he, in their presence, impacted another car and sped away from the

21   accident site.  Rodríguez' behavior constitutes a misdemeanor under

22   Puerto Rico law. See 27 L.P.R.A. §§ 5101-5102 (2006).  Thus, the

23   officers did not violate the Fourth Amendment in arresting Rodríguez.

1        Nevertheless, the Fourth Amendment also prohibits the use of

2   excessive force in effecting arrests.  See Morelli v. Webster, 552

3   F.3d 12, 23 (1st Cir. 2009).  Excessive force is "force that was

4   unreasonable under all the circumstances."  Id. (citing Graham v.

5   Connor, 490 U.S. 386, 397 (1989)).  To determine whether the force

6   applied was unreasonable, we look to certain criteria, including "the

7   severity of the crime at issue[;] the extent (if any) to which the

8   suspect poses an immediate threat to the safety of the officers or

9   others; and whether the suspect is actively resisting arrest or

10  attempting to evade arrest by flight."  Id. (internal quotation marks

11  omitted) (quoting Graham, 490 U.S. at 396).

12       The evidence on the record in the present case suggests that the

13  force used against Rodríguez during his arrest was excessive.[2]

14  According to Ramos' testimony, Rodríguez was arrested for a hit-and-

15  run.  There is no evidence that Rodríguez was "resisting arrest or

16  attempting to evade arrest by flight," as no one claims that the

17  officers who initially approached Rodríguez were attempting to arrest

18  him.  In fact, when he first heard police sirens, Rodríguez

---

[2] Movants argue that "[t]he force used during the arrest was . . . reasonable, specially [sic] given the circumstances of the case in which plaintiff Rodríguez had tried to escape and also the fact that he was drunk."  (Docket No. 70 at 15.)  But no evidence shows that the initial approach was an attempted arrest from which Rodríguez tried to "escape"; indeed, no one offers any explanation whatsoever as to the character of that approach.  Furthermore, Ramos testified that the officers did not know Rodríguez was drunk until after they interviewed him at the police station. (Docket No. 81-2 at 3; see also Docket No. 81-3 at 14.)

1   immediately pulled over and fully cooperated with the police at all

2   times thereafter. While arguably Rodríguez' apparently reckless

3   driving posed "an immediate threat" to public safety, a reasonable

4   jury could find that the arrest described above in Part I was,

5   nevertheless, excessively forceful under the circumstances.

6        **2.  Fourteenth Amendment**

7        Generally, we apply Fourth Amendment analysis to claims of

8   unlawful seizures.  But we find that some of the alleged behavior in

9   this case requires analysis under Fourteenth Amendment substantive

10  due process instead.  This is because the unexplained behavior of the

11  officers, that initial approach that startled Rodríguez into his

12  flight, did not constitute a "seizure" in the constitutional sense.

13  See County of Sacramento v. Lewis, 523 U.S. 833, 843-44 (1998)

14  (citing California v. Hodari D., 499 U.S. 621, 626 (1991))

15  (discussing Court's holding that a mere attempt to seize "does not

16  amount to a 'seizure' within the meaning of the Fourth Amendment").

17  Thus the behavior surrounding that approach is not governed by the

18  Fourth Amendment, and we must turn instead to the Fourteenth

19  Amendment.

20       The Fourteenth Amendment prohibits the deprivation of a person's

21  life, liberty, or property by a state or territory without due

22  process of law. U.S. Const. amend. XIV, § 1; see Exam'g Bd. of

23  Eng'rs, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 586

1   (1976) (applying Due Process Clause to U.S. territories).  "The

2   touchstone of due process is protection of the individual against

3   arbitrary action of the government . . . ."  County of Sacramento,

4   523 U.S. at 845-46 (quoting Wolff v. McDonnell, 418 U.S. 539, 558

5   (1974)).

6        "Fourteenth Amendment substantive due process claims often turn

7   on whether the alleged misconduct 'shocks the conscience.'"

8   Maldonado v. Fontanes, 568 F.3d 262, 272 (1st Cir. 2009).  And "the

9   official conduct 'most likely to rise to conscience-shocking level'

10  is 'conduct intended to injure in some way unjustifiable by any

11  government interest.'"  Id. at 273 (citing Chavez v. Martinez, 538

12  U.S. 760, 775 (2003)).

13       The record in this case reveals no justification whatsoever for

14  the officers' initial approach.  Rodríguez' hit-and-run provided the

15  only justification for interacting with Rodríguez at all, and that

16  event transpired only after the initial approach.  Toledo and Ramos

17  ignore this glaring omission, deeming it immaterial by maintaining

18  that Ramos was not present at that initial approach.  (See Docket No.

19  70 at 8 ("Ramos arrived to the scene for the first time, once

20  [Rodríguez'] arrest had taken place.").)  We find this argument

21  untenable, as Ramos himself testified that he had witnessed the hit-

22  and-run.  (See Docket No 81-6 at 2.)  Without any explanation as to

23  the government's intent or interest, and with evidence from

24  Plaintiffs suggesting that Rodríguez was approached for no legally-

1    cognizable reason, we cannot but consider the government's conduct

2    arbitrary. And, given the understandable distress said behavior

3    caused Rodríguez, a reasonable jury could certainly find that said

4    arbitrary conduct shocks the conscience.

5         **3.   Movants' Involvement**

6         As to Ramos' involvement in the alleged Fourth Amendment

7    violation, we need only note his testimony that he was "the person

8    who effected the arrest." (Docket No. 81-2 at 8; see also id. at 11

9    ("Q: Could you tell us who was the person who restrained [Rodríguez]?

10   A: Myself.").) As to his involvement in the alleged Fourteenth

11   Amendment violation, we again need only note his testimony that he

12   was present for the hit-and-run, which was the site of the initial

13   approach. (See Docket No. 81-6 at 2.)  These facts satisfy us that

14   a reasonable jury could find that Ramos was directly involved in both

15   of the alleged constitutional violations.

16        As to Toledo's involvement, we must inquire as to whether his

17   conduct "could be characterized as supervisory encouragement,

18   condonation or acquiescence or gross negligence amounting to

19   deliberate indifference." See Pineda, 533 F.3d at 54; see also supra

20   (discussing standard for supervisory liability).  For his behavior to

21   amount to at least deliberate indifference, we must find that Toledo

22   knew of the risk of constitutional violations to people in Rodríguez'

1    position but failed to take reasonable steps to abate that risk.

2    Cf. Burrell v. Hampshire County, 307 F.3d 1, 7-8 (1st Cir. 2002).

3         The record shows that Toledo regularly received reports

4    regarding complaints against officers (Docket No. 81-4 at 2); this

5    supplies the requisite showing that Toledo knew of the risk to the

6    constitutional rights of people like Ramos.  The record also shows

7    that Toledo, through his subordinates, required constitutional-

8    compliance training for officers like Ramos but failed to ensure that

9    this training took place (see Docket Nos. 81-4 at 4, 6; 81-2 at 10);

10   this supplies the requisite showing that Toledo failed to take

11   reasonable steps to abate said risk.  Thus, Plaintiffs have provided

12   sufficient evidence to survive summary judgment on the issue of

13   Toledo's supervisory involvement in the constitutional violations at

14   issue in this case.

15   **B.   Qualified Immunity**

16        Movants argue that they are entitled to qualified immunity

17   because Ramos' actions did not violate Rodríguez' constitutional

18   rights. (Docket No. 70 at 17-18.)

19        Qualified immunity protects state officials from the burden of

20   standing trial or facing other onerous aspects of litigation.

21   Saucier v. Katz, 533 U.S. 194, 200 (2001).  To determine whether

22   Movants are entitled to qualified immunity, we must ask "(1) whether

23   the facts alleged or shown by the plaintiff make out a violation of

1    a constitutional right; and (2) if so, whether the right at issue was

2    'clearly established' at the time of the defendant's alleged

3    violation." Maldonado v. Fontañes, 568 F.3d 263, 268-69 (1st Cir.

4    2009) (citing Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009)).

5    The second prong of the Pearson analysis entails two separate

6    inquiries: First, whether the right at issue was sufficiently clear;

7    and second, whether under the facts of the particular case, a

8    reasonable defendant would have known that his conduct violated that

9    right. Id. at 269 (citing Brousseau v. Haugen, 543 U.S. 194, 198

10   (2004); Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

11       We already determined that Plaintiffs proffered sufficient

12   evidence to establish violations of Rodríguez' Fourth and Fourteenth

13   Amendment rights, supra Part III.A.1-2, and, accordingly, we find the

14   first prong satisfied. We also find that both the Fourth Amendment

15   right to be free from excessive use of force and the Fourteenth

16   Amendment right to be free from arbitrary, injurious government

17   action are clearly established. See supra Part III.A.1-2.

18       Further, for the reasons stated above, supra Part III.A.1, a

19   reasonable officer in Ramos' position would have known that the force

20   used in Rodríguez' arrest was excessive under the circumstances.

21   Similarly, on this record, a reasonable officer in Ramos' position

22   would have known that the intervention with Rodríguez was arbitrary,

23   injurious government conduct. See supra Part III.A.2. As to Toledo,

24   a reasonable officer in his position would have known that the

Civil No. 08-1016 (JAF)                                         -14-

1    failure to adequately train officers like Ramos as to constitutional

2    compliance directly contributes to the perpetration of constitutional

3    violations by such officers.  <u>See</u> <u>supra</u> Part III.A.3. Given the above

4    conclusions, we find that Movants are not entitled to qualified

5    immunity, and we strongly urge the parties to settle this case.

6                                    **IV.**

7                                 <u>**Conclusion**</u>

8        For the reasons stated herein, we **GRANT IN PART** and **DENY IN PART**

9    Movants' motion for summary judgment (Docket No. 70). We **DISMISS**

10   Plaintiffs' Fourth Amendment claim that Rodríguez was arrested

11   without probable cause, but we **RETAIN** all other claims.

12       **IT IS SO ORDERED.**

13       San Juan, Puerto Rico, this 5th day of November, 2009.

14                                   s/José Antonio Fusté
15                                   JOSE ANTONIO FUSTE
16                                   Chief U.S. District Judge